### EMMET WICKHAM v. GEORGE COYNER.

1. TEMPORARY CHANGE OF RESIDENCE AS AFFECTING RIGHT TO VOTE.
    Presence for a temporary purpose does not secure the right to vote, and absence for a temporary purpose does not forfeit the right.
    [For other cases in point, see 3 Cyc. Dig., "Elections," §§ 21-23.—Ed.]

2. RIGHT OF VOTER TO HAVE VOTE COUNTED.
    The right to have a legal ballot counted is the right of the voter who casts it and after it has been deposited in the box, the act or omission to act of no officer can deprive the voter of this right, so long as it is reasonably certain that the ballot remains unchanged.

3. AFFILIATION WITH A PARTY AS EVIDENCE OF VOTE FOR PARTICULAR OFFICE.
    The fact that a voter affiliates with a particular party cannot be considered as sufficient evidence of how he cast his ballot for any particular office, when the matter is in issue in an election contest.

4. PROOF OF NATIONALITY AND AGE AS DETERMINING RIGHT TO VOTE.
    A contestant having proved that a certain voter who was an alien could not have been naturalized on account of minority under the general provisions of the naturalization laws within one year before the contested election, is not bound to negative the exceptional circumstances under which the naturalization of such voter might have been effected at an earlier time.
    [For other cases in point, see 3 Cyc. Dig., "Elections," §§ 17, 18.—Ed.]

5. RULE DETERMINING RESIDENCE OF STUDENTS.
    There is no special rule for determining the residence of students for election purposes; the same rules that determine the domicile of other persons apply to them.
    [For other cases in point, see 3 Cyc. Dig., "Elections," §§ 21-23.—Ed.]

6. PRESUMPTIONS AS TO LEGALITY OF VOTE.
    The fact that a student voted raises a presumption of the legality of his ballot and of his innocence in casting the ballot, which presumption overcomes the presumption that the domicile given on the matriculation card of such student continues until affirmative evidence of a change is given.

Delaware County.

**7. TIME NECESSARY TO GAIN RESIDENCE AFTER MAJORITY.**

　A *person during minority has not the capacity to change his domicile and a student domiciled outside the state must remain in Ohio one year after attaining his majority in addition to the necessary intent to ·change his domicile to acquire a residence for voting purposes.*

**8. RIGHT OF LEGISLATURE TO IMPOSE AN EDUCATIONAL TEST FOR VOTING.**

　Under the constitution the legislature has no right to require voters to· possess an educational qualification, and any act of the legislature which has such effect, or which would prevent the judges of election from assisting other than those afflicted with blindness, paralysis, the feebleness of extreme old age, or other physical infirmity, is a limitation upon the constitutional right of the voter. *Semble.*

## MOONEY, J.

　This is a proceeding to contest an election of a common pleas judge,. brought under act 89 O. L. 363 (Lan. Rev. Stat. 4615; B. 3014-1),. etc. Emmet M. Wickham, the contestor, in his petition, states that the first subdivision of the sixth common pleas judicial district of Ohio is composed of the counties of Delaware, Knox and Licking; that the said county of Licking at the last federal census had the largest population of all the counties of said subdivision; that at the general election, held on November 5, 1901, there were four candidates in said subdivision for the office of judge of the court of common pleas in said judicial district, two of whom were to be elected; that one Charles W. Seward and the said George Coyner, who· is a resident of said county of Delaware, were such candidates on the Republican ticket, and one John Davis Jones and said Emmet M. Wickham were such candidates on the Democratic ticket; that on November 12, 1901, the canvassing board of said Licking county found and certified that the said Charles W. Seward had received for said office 12,527 votes; that the said George Coyner had received for said office 12,274 votes; that the said Emmet M. Wickham had received for said office 12,206 votes, and that the said John Davis Jones had received for said office 12,129 votes; and said canvassing board then found and, declared as the result of said election that the said Charles W. Seward and the· said George Coyner were elected such judges as aforesaid.

　· Emmet M. Wickham appeals from the finding and decision of said canvassing board and contests the election of said George Coyner to said office and avers that the said George Coyner did not receive the number of legal votes, so found by said canvassing board, but a much less number; that said Emmet M. Wickham received a much larger number of legal votes than the number so found by said canvassing

Wickham v. Coyner.

board and a much larger number of legal votes than was received by the contestee, the said George Coyner, and that, therefore, the contestor was and is duly and legally elected to said office of judge of the court of common pleas instead of the said George Coyner; and for grounds of such contest the contestor alleges the following facts:

First. In Scioto township and in Berlin township, Delaware county, there were cast for said contestor and not for said contestee, twenty-five legal votes, which votes the judges of election of said township failed and refused to count for said contestor.

Second. In each and every of the following precincts, townships and wards there were cast and counted for said George Coyner, none of which were counted for said Emmet M. Wickham, fifty illegal votes by persons who then and there did not possess the qualifications of legal voters at said election, viz.: In the townships of Brown, Orange, Radnor, Delaware county; in the first, second, third, fourth, fifth and sixth wards of the city of Delaware, Delaware county; in the township of Granville and in the village of Granville, Licking county; in the townships of College, Hilliar and Liberty, in Knox county.

Third. In Galena precinct, in Berkshire township, Delaware county, there was counted for the contestee and not for contestor one mutilated and fraudulent ballot.

Fourth. In the township of Brown, Delaware county, the judges of election conspired together to assist the inmates of the county infirmary to cast their ballots; that said inmates were not, under the law, entitled to be so assisted; that notwithstanding said fact, assistance in the marking of ballots was rendered by said judges, pursuant to their said conspiracy, and that all said inmates had their ballots marked and counted by said judges for said contestee and not for said contestor; that in said township said contestee had counted for him 172 votes; that said action of said judges rendered the election in said township illegal and void, and that that number of votes should be deducted from the votes cast for the contestee, or that, if said election in said township was not rendered wholly illegal and void, each ballot marked by the judges for said infirmary inmates was fraudulent and illegal, and that forty votes should be deducted from the total vote cast for said contestee.

Fifth. That there was a large number of disputed ballots returned in each of the three counties to the deputy state supervisors of elections, which should be counted for said contestor and not for said contestee, and were not so counted for contestor.

Delaware County.

To this petition the contestee answers and denies all grounds of contest set out in the petition and further answering says:

First. That the legal qualifications of all persons voting at said election in the several precincts named in the petition were passed upon by the judges of election and that the right of said persons to vote is, therefore, *res adjudicata*.

Second. That in Orange township, Delaware county, there were cast and counted for said contestor twenty illegal votes.

Third. That in the first, second, third, fourth and sixth wards in the city of Delaware, Delaware county; in the township of Granville, and in the village of Granville, Liberty, Union, Jersey, Newark, Licking and Hopewell townships; in the first, second, fourth and seventh wards of the city of Newark, Licking county; in the townships of College and Liberty, in Knox county, each, there were cast and counted for said contestor twenty illegal votes.

The contestor by reply, denies all the affirmative allegations contained in the answer of the contestee.

The rights of the parties to this proceeding require an examination of the law of the state as to the qualifications of electors; the preparation, reception and counting of ballots; the proceedings incident to the preservation of disputed or doubtful ballots, and the rules of procedure in contests of elections.

First, as to the qualifications of electors, Section 1, Art. 5 of the constitution of the state provides:

"Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of the state one year next preceding the election, and of the county, township or ward, in which he resides, such time as may be provided by law, shall have the qualifications of an elector and be entitled to vote at all elections."

And by Sec. 6 of the same article,

"No idiot, or insane person, shall be entitled to the privileges of an elector."

The color qualification is now abrogated by the fourteenth and fifteenth amendments to the federal constitution.

The qualification of residence is the one most frequently questioned in the case at bar. From the constitutional provision quoted, it appears that while the term of residence within the state is fixed by fundamental law, and the term within the counties, wards or townships is left for legislative regulation, yet the character of the residence within the state is in no manner distinguished from the residence within the several subdivisions of the state.

Wickham v. Coyner.

The legislature is not authorized to require another or different character of residence within the subdivisions than is required by the constitution within the state.

In *Sturgeon* v. *Korte*, 34 Ohio St. 525, this article of the constitution was under consideration by our Supreme Court.

Boynton, J., at page 534, says:

"The word 'residence,' as used in the constitution, has substantially the meaning of habitation, domicile, or place of abode. The law ascribes a domicile to every person, and no person can be without one.

"In *Bell* v. *Kennedy*, L. R. 1, H. L. 320, it was said by Lord Westbury, that domicile is the relation which the law creates between an individual and a particular locality or country. And by Judge Story, in his commentary on the Conflict of Laws, that it is of three sorts: domicile of birth, domicile of choice, and that which results from the operation of law. Section 46.

"Domicile of birth remains until another is chosen, or where a person is incapable of choosing, until one results by operation of law. To acquire a new residence or domicile, where one is under no disability to choose, two things must concur, the fact of removal and an intention to remain. The old domicile is not lost nor gone until the new one is acquired, *facto et animo*. It is not, however, necessary that the purpose to acquire a new residence should exist at the time of removal. It may be formed afterward. A residence may be acquired by one who has removed to a place for temporary purposes only, by a change of purpose, and an election of the new habitation or place of abode as his place of future domicile or home. * * *

" 'In a strict legal sense, that is properly the domicile of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning.' " Story, Conflict of Laws Sec. 41.

"It is not, however, necessary, that he should intend to remain there for all time. If he lives in a place, with the intention of remaining for an indefinite period of time, as a place of fixed present domicile, and not as a place of temporary establishment, or for mere transient objects, it is to all intents, and for all purposes, his residence. Story, Conflict of Laws Sec. 46. *Bruce* v. *Bruce*, 2 Bos. & Pul. N. R. 228; *Sears* v. *Boston*, 42 Mass. (1 Metc.) 250.

"These are well-settled rules relating to the selection or change of residence, existing when the constitution was adopted, and consequently apply in all cases where a change of residence results from,

Delaware County.

or depends upon choice. \* \* \* Residence resulting from the operation of law supervenes upon a disability to make choice. Minors being incapable of acquiring a domicile, retain that of their parents. \* \* \* A person under the power and authority of another \* \* \* is incapacitated to choose a residence."

To a majority of the court, Judge Sullivan dissenting, it seems that the rules here laid down are so clear in their statements and so well supported by both reason and authority outside the state, that any investigation of cases in other states, however interesting it may be as a matter of legal study, is quite unnecessary to determine what the rules in Ohio are, determining whether a particular person has or has not a right to vote at a particular poll. There is no special rule as to students. Their residence is to be determined by the same rule as other persons.

It would be an endless task to state here at length the particular facts which we concluded to be of controlling effect in the case of each person whose right to vote has been called to the attention of the court.

We need only say that from all the evidence bearing upon the right of each person to vote, his right has been separately considered and determined. The statement of a few typical cases will sufficiently indicate the application of the rules of law to the cases in general:

Stanley C. Roettinger came from his parent's home in Hamilton county to pursue his studies at the Ohio Wesleyan University. At the date of his matriculation he was a minor. He spends his vacations not at Delaware, but, in the main, at his parent's home. When he leaves Delaware at the close of each school year, he intends to return at the beginning of the next school year to continue his studies. He has no business nor occupation other than student and limits his stay in Delaware each year to the time school is in session.

He has formed no plans for the future. We are not informed as to the source from which his support is derived. When he arrived at his majority, his residence was at the home of his parents. To change this residence required an active intent upon his part. This intent is not shown by the facts in evidence. His attendance at school since attaining his majority is not different in any respect from what it was within his minority at Delaware. We are of opinion that his residence on November 5, 1901, was at Wyoming, Hamilton county, Ohio, and not at Delaware, and that his vote at Delaware was illegal.

John Eddy Austin attained his majority in July, 1901. More than one year prior to that time he came to Delaware from his father's home at Chattanooga, Tennessee. The father maintained his residence in Tennessee continuously until the time of this trial. During the minority

Wickham v. Coyner.

of the son his residence continued in Tennessee by operation of law. He had not legal capacity to change from this residence to a new one of his choice. He did not become vested with capacity to choose a residence until July, 1901.

If he then selected Delaware, Ohio, as his home, less than one year intervened before the election at which he voted. Hence he did not possess the qualifications of residence required by the terms of the constitution and his vote was illegal.

Frank Whitehouse states, in his matriculation card, that his native country is England. He was born in September, 1879. On or before November 5, 1901, he could not have been naturalized under either Sec. 2165 or 2167 U. S. Rev. Stat. for defect of age.

Upon this showing, unexplained by him or by some one testifying to an exceptional state of facts, Mr. Whitehouse was neither an American citizen nor a legal voter when he cast his ballot. There are exceptional circumstances recognized by the statutes of the United States under which he could have been naturalized, but these exceptional circumstances are in the nature of provisos to the general section of the naturalization act; and it is not necessary that the contestor here should negative the existence of facts which would bring Mr. Whitehouse within any proviso outside the ordinary provisions of the law.

C. M. Shaff came to Delaware from Napoleon, Ohio, for the sole purpose of completing the business course. This, he believes, will require about seven months attendance at the university. His stay at Delaware is without intent as to change of residence. His domicile thus clearly appears to have been at Napoleon in November, and his vote was illegal.

Richard Roe came to Delaware from Illinois and voted at Delaware in November. By action of the faculty in December he was requested to sever his connection with the school. He returned to Illinois to his parent's home and in correspondence claims that place his home and spoke of his returning to Illinois as an unexpected home-coming. We find on these facts that his vote at Delaware was illegal.

E. A. Hotchkiss is self-supporting. He came to Delaware intending to complete a course and work there mainly to increase his resources. He has an arrangement to stay in Delaware after completing his college course. He has an intention not to return to the place of his former residence. His vote was legal.

Henry Graphius came to Delaware in September, 1901, from his parent's home in Cincinnati. While at Cincinnati and living with his parents he paid them board. He is self-supporting and came to Dela-

Delaware County.

ware to work his way through and testifies that since September, 1901, he has regarded Delaware as his only home. In September he formed an intention, after coming to Delaware, not to return to Cincinnati. He had attained his majority long before September, 1901. His vote was legal.

John Poland is married, not separated from his wife, and prior to September, 1901, resided in Franklin county, Ohio. Intending to move his family to Delaware county, he broke up housekeeping in Franklin county in September; went to Delaware county in that month, worked there, procured a dwelling for his family, and on October 11, 1901, he moved his family from Franklin county to Delaware county. His family was in transit until October, 1901, and until that date the change of his residence to Delaware county was not complete. His vote was illegal.

Banny Stull resided with his family in Knox county more than eight months prior to November, 1901. He surrendered the farm upon which he was living in the spring of 1901 with no intent to return to the farm. He took a cropper's lease on a farm in Licking county and moved there with the then intention to remain only until the fall of 1901, and then to return to Centerburg, Knox county.

He did return to Centerburg, Knox county, on October 15, 1901, and voted in Knox county. His going to Licking county was for temporary purposes only. His surrender of the house in which he resided in Knox county did not forfeit his residence in that county. He was a legal, qualified voter in Knox county. Under the facts as disclosed he would have been qualified to vote in Knox county, even though his family had not returned there before election. Presence for a temporary purpose does not secure the right to vote, and absence for a temporary purpose does not forfeit the right.

For the same reasons Lem. A. Brandebury is legally qualified to vote in his "old ward" in Delaware.

The persons who were employed in the construction of the electric railway in Orange township, Delaware county, were present in that township only for the purpose of railway construction. The tents in which they were housed were of a character to indicate conclusively the temporary purpose of their stay in Delaware county.

None of these persons, so far as shown by the evidence in this case, were legal voters in Delaware county.

We find no defect in residence of any inmate of the Delaware county infirmary, and we are of opinion that Jacob Lumbert was domiciled in Brown township and properly voted there.

From the evidence we find affirmatively that the following students

Wickham v. Coyner.

were legal, qualified electors: In Delaware, [forty-two were named]
* * *; Granville, [eleven] * * *; Gambeir, [six] * * *.

The following named students voted for neither or for both of the
parties litigant here, and for that reason their several qualifications were
not considered by the court:

In Delaware: [six were named] * * *; Granville, [two] * * *.

Many persons whose residence is in question claimed their privilege
as witnesses not to answer questions with reference to that fact. As to
these persons, we have the evidence of their matriculation cards, which
contain a statement of the former home of each matriculent, and the
fact appearing, from the evidence, that these persons are all students
at the place at which they voted.

For the contestor it is claimed that from the fact that these voters
are students, and from the presumption that the place of domicile
shown continues until affirmative evidence of a change is given, that
this evidence is sufficient to show that these voters were not residents of
the wards and precincts in which they voted.

We are of opinion that the fact that a person voted raises a pre-
sumption of the legality of his ballot and of his innocence in casting
the ballot. It thus appears that the presumption of the continuance
of domicile is in conflict with the presumption of the innocence of the
voter.

In such cases, the presumption of innocence overcomes the presump-
tion of continuance. Lawson, Presumptive Evidence 665, Rule 122,
Subsec. D. And on such state of proof, we must find in accordance with
the presumption of innocence, that such persons are legal residents of
the precincts in which their several ballots were cast.

The fact that these students claimed their privilege is, for a reason
hereinafter stated, not a matter of evidence tending to prove that the
witness claiming the privilege was a nonresident; nor is the fact that
the occupation of the voter is that of a student sufficient to overcome
this presumption of innocence, for a student may have a domicile at the
seat of a university.

The students who, in accordance with this rule, are held to be legal
residents of the precincts in which they voted are the following:

In Delaware. [twenty-eight were named] * * *; Granville,
[eleven] * * *; Gambier, [eight] * * *.

The students who voted and whose right was questioned by either
party, other than those above named, we find to have voted without
legal qualification so to do. But, by reason of defect of evidence to the
point, we are not able in many cases to find for whom many of them

voted. There is some evidence as to the politics of nearly all of these voters and nearly all of them claimed their privilege when asked to testify as to their political affiliations in general or as to the candidates for whom they voted for common pleas judge.

The privilege not to answer is the privilege of the witness. With the exercise of this privilege neither of the parties litigant have, in legal contemplation, anything to do. When a voter is called as a witness by the contestor and claims his privilege not to answer concerning his politics, it cannot be inferred from that fact alone that such witness is a Republican; nor can the refusal of a witness to answer the same question put by the contestee give rise to the presumption or to an inference that such witness is a Democrat.

"If a witness declines to answer a question on the ground that his answer might criminate him, no inference of the truth of the matter inquired of may be drawn from that circumstance." 1 Greenleaf, Evidence Sec. 451; *Rose* v. *Blackmore*, R. & M. 383; *Ohelin* v. *Kenderdine*, 20 Pa. St. 354; *Rex* v. *Watson*, 3 E. C. L. 357.

And these witnesses not being parties, no inference can arise from their failure or refusal to explain.

Nor, it seems to a majority of the court, Judge Day dissenting, can the fact that a voter affiliates with a particular party be considered as sufficient evidence of how the voter cast his ballot for any particular office, when the matter is in issue in an election contest.

It seems to a majority of us that something more than political affiliation is necessary to be shown in such case. Political activity, enthusiasm for a political party at a particular election, declarations of the voter attending the act of voting, or other circumstances, are necessary to be shown before a court can hold as a matter of fact that a voter supported a particular candidate; and this should be more particularly the case, when, as in the case at bar, it seems that there was quite a degree of independence manifested by the voters in their support of the candidates for common pleas judge.

We do find from the evidence that the following disqualified voters cast their ballots for George Coyner and not for Emmet M. Wickham:

In Delaware, [fourteen were named] * * *; Granville, [seven] * * *; Gambier, [fifteen] * * *; three employes on the electric railway.

We find, too, that William Palmer, an inmate of the Delaware county infirmary, was insane, and was not qualified to vote, and that he voted for George Coyner, and not for Emmet M. Wickham.

The following students voted for Emmet M. Wickham and not for

Wickham v. Coyner.

George Coyner, and each of said voters were without legal qualifications:

In Delaware, [seven were named] * * *; Granville, [two] * * *.

We further find that the following persons, other than students, voted for George Coyner and not for Emmet M. Wickham, and that the said voters were each of them nonresidents of the precincts in which they voted: [four] * * *.

We find that C. W. Shotboldt was insane when he voted, but from the evidence we are not able to find to whom his vote was cast for common pleas judge. This disposes of all cases of importance in this contest so far as the legal qualifications of the persons voting are concerned.

As to doubtful ballots certified to the board of deputy supervisors of elections: The purpose of the Australian ballot is to promote the purity of elections by securing absolute secrecy of the ballot, and such uniformity in the marking of tickets as will render it impossible for corrupt persons to discover, from an inspection of a ballot during the count, that any deal made has been carried out.

It is held practically by all the courts that when the statute prescribes a method for marking the ballot, the observance of such method is mandatory upon the voter, and that any ballot not complying with the law must be rejected. In Ohio it is provided that, where a ballot is marked so that the intention of the voter may be ascertained, technical irregularities in marking it shall not vitiate the ballot; but it is believed that the ticket must be so marked and the intention of the voter be so manifested, that the ticket upon inspection will not be so different in marking from tickets properly voted that one, by prearrangement with voters, could ascertain that an understanding with reference to the manner of voting had been carried out.

Of the "doubtful ballots" in Delaware county, the one ballot in Delaware precinct, Delaware township, should not be counted; the one ballot in Oxford precinct, Delaware county, should not be counted; the one ballot in Radnor precinct should be counted for George Coyner; the two ballots in Sunbury precinct, Berkshire township, should not be counted; the one ballot in Trenton precinct, Trenton township, should not be counted; ballot No. 1, in Marlborough precinct, Delaware county, should not be counted; No. 2 is so marked as to be readily recognized by anyone as different in marking from that required by the statute. The ballot should not be counted. It was, however, counted for Coyner and should be deducted from his vote. The Genoa ballots are all unmarked and cannot, therefore, be counted. The Scioto ballot was counted

Delaware County.

for Wickham, but by reason of a mark after the name of Overturf was,. in our opinion, mutilated, and should not be counted.

Ballot No. 2 does not vote for any candidate for common pleas judge, and cannot be counted.

Harlan ballot No. 1, both tickets marked, should not be counted.

The nine Liberty township ballots, which were not counted for anyone, should be disposed of as follows:

Number 1 should not be counted for any candidate for judge.

Number 2 should be counted for Wickham and not for Coyner.

Number 3 should not be counted.

Number 4 should be counted for Wickham and not for Coyner.

Number 5 should not be counted.

Number 6 should be counted for Wickham and not for Coyner.

Number 7 should not be counted.

Number 8 should be counted for Wickham and not for Coyner.

Number 9 should be counted for Wickham and not for Coyner.

As to Knox county: The doubtful ballots in this county, after reaching the hands of the board of deputy state supervisors of election properly sealed up, were, through the desire of the board to add to their information, improperly opened. It is in evidence that the ballots, as attached to the depositions in this case, are in the same condition that they were when thus improperly opened.

While the case is not free from doubt, we are of opinion in such state of proof that the ballots should be counted. The right, after all, to have the ballots counted, is the right of the voters who cast the ballots,. and after a legal ballot has been deposited in the box the act of no officer, or his omission to act, should deprive the voter of the right to have the ballot counted, so long as it is reasonably certain that the ballot remains unchanged and so can be counted for the candidates for whom it was cast. We think the evidence here fairly shows that these ballots. have not been tampered with.

Exhibit A, ballot No. 1, should not be counted; the ballot is mutilated.

Number 2 should not be counted; it bears a distinguishing mark, a double X.

Number 3 is not voted for any candidate for common pleas·judge.

Number 4 bears a distinguishing mark in that an X is marked before a blank space on one of the third party tickets. This ballot was. counted for Coyner and should be deducted.

Ballot No. 5 is mutilated and should not be counted.

Ballot No. 6 should not be counted; the ballot bears a distinguishing mark the same as No. 4.

Ballot No. 7 is mutilated; the name of the democratic candidate for representative is written in the space devoted to that office on the republican ticket and the name of the republican candidate for representative is erased, and the ballot is otherwise mutilated. This ballot was counted for Coyner and should be deducted from his vote.

Ballot No. 8 bears a distinguishing mark, the same as No. 4, and should not be counted. It was counted for Coyner, and should be deducted from his vote.

Ballots Nos. 9 and 10 should not be and were not counted.

Ballot No. 11 bears a distinguishing mark, the same as No. 4. It was counted for Coyner and should be deducted from his vote.

It is not certain to us whether ballot No. 12 was counted or not. In such state of the proof, it must be presumed that the election officers did their duty and, because the ballot is mutilated, rejected it.

We find upon the evidence that the Galena ticket referred to in the evidence bears a distinguishing mark; that it was counted for Coyner and should be deducted from his vote.

In Berlin township the claim is made by the contestor that certain tickets were marked for Seward and Wickham, and had an X mark in the circle at the head of the republican ticket; that these ballots were counted for Coyner alone.

This is disputed by the contestee and evidence is adduced by each party in support of his contention. The question is one to be determined upon the weight of the evidence, and inasmuch as Judge Sullivan was not present when this testimony was received, the conclusion reached with reference to this matter is not participated in by him. Owing largely to the fact that the qualified denial of the witness called to impeach the testimony of Delbert Mooney—and the general conduct of this witness upon the stand does tend to the impeachment of Mr. Mooney —to the fact that an equal number of witnesses testified in behalf of the contestor and that the credit of none of these witnesses is called in question, and to the fact that the correctness of the count in Berlin township seems to have been since the election under discussion, for which, it would seem, there was no reason unless the contestor's claim has some existence in point of fact, we arrive at the conclusion that in this township certain ballots were improperly counted for George Coyner when they should have been counted for Emmet M. Wickham, and upon the evidence adduced to the point bearing upon the number, we conclude that eight ballots were so counted.

Delaware County.

Those eight ballots should be added to the total vote of Emmet M. Wickham, and should be deducted from the total vote of George Coyner.

As to the conduct of the election in Brown township: We are satisfied from the evidence that the judges of election in Brown township assisted certain inmates of the infirmary in marking their ballots. One of these inmates testified on the trial in this case. It seems that he was upward of eighty years of age. He was not able to read, and while he was able, unassisted, to mark his ballot to vote a straight ticket, would require some assistance in marking a scratched ticket.

It is also in evidence that a blind man was assisted, and that one suffering from paralysis was assisted by the judges, and in general that no one asked for assistance in marking his ballot in Brown township, who was not given such assistance.

It seems that the judges, one from each political party, assisted in marking, but all the judges in this township were friendly to the election of George Coyner as common pleas judge.

It is not in evidence that all the persons who asked assistance were persons who, in accordance with the provisions of the statute, would be entitled to demand it. Nor does it appear that anyone who was actually assisted was a person who, under the statute, was not entitled to receive such assistance.

We are not unmindful of the provisions of Sec 22, 98 O. L. 223 (Lan. Rev. Stat. 4536; B. 2966-37):

"Any elector who declares to the presiding judge of election that he is unable to mark his ballot by reason of blindness, paralysis, extreme old age or other physical infirmity, and such physical infirmity is apparent to the judges to be sufficient to incapacitate the voter from marking his ballot properly, may, upon request, receive the assistance, in the marking thereof, of two of the judges of election belonging to different political parties, and they shall thereafter give no information in regard to the matter; but such assistance shall not be rendered for any other cause which the voter may specify and a presiding judge may require such declaration of disability to be made by the elector under oath before him."

Under the constitution of the state, electors are not required to possess an educational qualification, and the legislature has no power to require qualifications in addition to those named in the constitution.

It is the right of the elector to vote a straight party ticket, and any legislation which has the necessary effect to require an elector to satisfy himself by casting a straight party ticket, and prevent or greatly hinder

Wickham v. Coyner.

the casting a scratched ticket, would be such an invasion of his rights as an elector as would render the enactment invalid.

Under the Australian ballot law an elector is handed a ticket with the names of all duly nominated candidates printed upon it. To select and vote for the different candidates without assistance requires at least the ability to read the names of the candidates; and to vote for any person for any office unless such person is a duly nominated candidate for such office, requires the added ability to write.

To place such a ticket in the hands of an elector, to compel him to retire to a booth and prepare his ballot, without assistance, cannot be considered in any light other than a direction to him to read party emblems, to vote a straight ticket, and to deprive him of all opportunity to vote for any candidate not upon the one ticket or the other.

In harmony with these views we are of the opinion that if the case required it, we would hold that the direction that the judges should not render assistance to voters other than those afflicted with blindness, paralysis, the feebleness of extreme old age, or other physical infirmity, is a limitation upon the right of an elector to cast his ballot not warranted by the constitution of the state.

But while the number of voters assisted in Brown township seems to have been large—the precise number from the evidence we are not able to determine—yet there is no proof that any elector not within the terms of the statute was assisted, or that any elector was in any way impeded or controlled in the casting of his ballot; but that all ballots were marked and counted for the candidate for common pleas judge for whom the several electors desired to vote.

Under these circumstances we find that there was no fraud nor irregularity in the conduct of the election in this township that should cause the rejection either of the entire poll of the township or of any of the votes cast for George Coyner.

It will appear from the foregoing that there should be deducted from the vote of George Coyner, student votes; fourteen in Delaware, seven in Granville, fifteen in Gambier, three employes on the electric railway, the votes of William Palmer, John Polan, T. N. Dickson and Frank and Able Wilson; total fourty-four votes.

There should be also deducted ticket No. 2, returned as doubtful from Marlborough precinct, and ballots Nos. 4, 7, 8 and 11 in Knox county, and the Galena ticket, and eight votes improperly counted for Coyner in Berlin township; total deductions, fifty-eight; and that there should be added to Coyner's vote the Radnor township ballot, one vote, making the net deduction from the Coyner vote, fifty-seven.

Delaware County.

The total vote as declared by the canvassing board is 12,274; deduct fifty-seven votes, equals 12,217, the true legal vote cast for George Coyner so far as the votes adduced on this hearing shows.

There should be deducted from the vote cast for Emmet M. Wickham, student votes, as follows: Delaware, seven votes; Granville, two votes; and the Scioto township ticket. Total deductions ten votes.

There should be added to the vote for Emmet M. Wickham, ballots Nos. 2, 4, 6, 8 and 9, Liberty township, and the eight votes in Berlin township cast for Wickham and improperly counted for Coyner. Total additions thirteen, and the net additions three.

The total vote for Wickham, as found by the canvassing board is 12,206; add three, equals 12,209; the true number of legal votes cast for Emmet M. Wickham, as far as the evidence shows. Thus, the net majority for George Coyner over Emmit M. Wickham, for the office of common pleas judge was eight votes, and we so find.

If the eleven votes referred to in the dissenting opinion be charged to the contestee, then, by a parity of reasoning, the vote of Long, the railroad employe, should also be so charged. This would make twelve illegal votes to be deducted from Coyner's vote. In all fairness, the seven employes of the railway should then be charged to contestor, and should be deducted from Wickham's vote. This would change Coyner's majority, but would not change the result.

The five votes referred to in the dissenting opinion were not charged to Coyner for the reason that as to these for want of evidence it could not be determined that these persons were illegal voters.

As to the entire sixteen votes referred to, the majority of the court simply hold, as we believe, in accordance with all the authorities, that the claim of privilege and the consequent refusal of a witness, not a party, to testify, is not in any manner or for any purpose to be taken as proof for or against either party to any litigation.

It is manifest that very many republicans, on account of the known fitness and enviable record of Judge Wickham, voted for him for common pleas judge, and so, in the case at bar, mere proof of politics is more than ordinarily unsatisfactory as proof that the republicans of the subdivision, and particularly of Delaware, voted for the republican candidate, who was then without judicial experience.

Coming now to adjudge the costs in this proceeding, we are of the opinion that the questions here raised and now decided are of such public importance that the state should pay a large part of the costs incurred.

To us it seems just and equitable, under all the circumstances in

Wickham v. Coyner.

this case, that the costs of the clerk and sheriff of Delaware county should be paid by the contestor in this proceeding, and that all other costs incurred should be paid from the state treasury, and it is so ordered.

**Sullivan, J.,** concurs.

**DAY, J.,** dissenting.

I do not concur in the general finding of the court in favor of the contestee. I am entirely satisfied, from careful consideration of such evidence and data, as the obstructive and suppressive methods pursued by many of the witnesses allowed the court to obtain, that the contestor received a clear majority of the votes cast by voters having a legal domicile in the common pleas subdivision, composed of the counties of Delaware, Knox and Licking.

In addition to the illegal votes eliminated from the count, the court found eleven other persons who had cast illegal ballots, they not being legally domiciled in the township, precinct or ward where the ballot was cast, each one of whom, on being afforded an opportunity, refused to enlighten the court or to give any testimony concerning the material facts, if he voted at the November election, for whom he voted or even to advise the court of the fact to which, if either, of the two political parties, presenting candidates for the office of common pleas judge, he was a member of, or affiliated with.

The refusal was based upon the ground—the alleged ground—that a truthful answer would have a tendency to incriminate.

It was clearly shown that each of them voted in the subdivision, at the election of November 5, 1901. It was also made to appear, by undisputed and competent evidence, that all of them were affiliated with and were classed and regarded by their fellows and persons interested in politics and keeping watch over the political field, as undoubted members of the party whose candidate the contestee was.

This fact standing alone, possibly, was insufficient and did not, to an absolute certainty, point to the candidate for whom the votes were cast; but in view of the fact that each of these persons, who alone knew the exact truth, and who, contrary to the good and wholesome advice given them by the chief officials of the university, to tell the truth and the whole truth, without fear, as there was no danger of prosecution, deliberately and persistently refused to aid the court to a right decision, in view of the presumptions arising from certain established facts, and of other facts appearing, including the conduct and demeanor of each of them in the presence of the court, and of their manifest desire to say

only that which would benefit the contestee; I am of the opinion the evidence was of such consistence, significance and weight, as to justify and make imperative a finding that each and all of them voted for the contestee.

Five other persons voted, it was clearly made to appear, for the contestee; and I am of opinion that the evidence adduced concerning their former domiciles and the temporary character of their presence in the judicial subdivision warranted and required the finding that neither of them was legally domiciled in the township or ward where the votes were cast.

These sixteen votes, all of them, I think, should have been deducted from the total vote of the contestee.

In each case, however, the court was of opinion the evidence was not sufficient to establish the fact claimed, and the vote as canvassed and returned by the supervisors of election, was, so far as these votes are concerned, not disturbed but allowed to stand; and upon these grounds I base a dissent to the general finding in favor of the contestee.

In all other respects, I fully concur in the rulings and judgments announced.